UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
SARL LOUIS FERAUD INTERNATIONAL,                             :
                                                             :
                              Plaintiff,                     :
                                                             :
              -against-                                      :        04 Civ. 9760 (GEL)
                                                             :
VIEWFINDER INC. d/b/a FIRSTVIEW,                             :
                                                             :
                              Defendant.                     :
                                                             :
-------------------------------------------------------------x        **OPINION AND ORDER**
                                                             :
S.A. PIERRE BALMAIN,                                         :
                                                             :
                              Plaintiff,                     :
                                                             :
              -against-                                      :        04 Civ. 9761 (GEL)
                                                             :
VIEWFINDER INC. d/b/a FIRSTVIEW,                             :
                                                             :
                              Defendant.                     :
                                                             :
-------------------------------------------------------------x

James P. Duffy, III, Berg and Duffy, LLP,
Manhasset, New York, for Plaintiffs Sarl
Louis Feraud International and S.A. Pierre Balmain.

Steven J. Hyman and Paul H. Levinson,
McLaughlin & Stern, LLP, New York, New York,
for Defendant Viewfinder Inc.


GERARD E. LYNCH, District Judge:

        Plaintiffs brought these actions to enforce default judgments they had obtained against

defendant in a French court.  This Court dismissed the action, finding that enforcing the

judgment would violate New York's public policy because defendant's actions were protected

by the First Amendment, Sarl Louis Feraud Int'l v. Viewfinder Inc., 406 F. Supp. 2d 274

(S.D.N.Y. 2005) ("Feraud I").  The Court of Appeals vacated and remanded, instructing this Court to consider first, whether the defendant's actions would be protected by the fair use doctrine under American law, and second, if they were so protected, whether French intellectual property law provides protection comparable to that afforded by the fair use doctrine.  Sarl Louis Feraud Int'l v. Viewfinder Inc., 489 F.3d 474 (2d Cir. 2007) ("Feraud II").

The Court of Appeals having declined to resolve the issue of fair use itself, finding that "the record before us is insufficient to determine fair use as a matter of law," 489 F.3d at 483, this Court permitted additional discovery on that issue.  Following discovery, rather than proceed to a hearing to determine the matter, plaintiffs moved for summary judgment, contending that, on the basis of the facts now in evidence, a court applying American law would be required to rule against defendant's fair use claim as a matter of law.  Because resolution of the fair use issue will require detailed findings of fact regarding matters about which there are genuine disputes, the motion will be denied.

## BACKGROUND

Because the procedural and factual background to this dispute is set forth in some detail in Feraud I and Feraud II, only those facts bearing directly on this motion will be presented here. The plaintiffs, Sarl Louis Feraud International ("Feraud") and S.A. Pierre Balmain ("Balmain"), are French corporations that design and market high-fashion clothing.[1]  From 1996-2001, the period relevant to the underlying French Judgment, plaintiffs were members of the Fédération

---

[1] Feraud is no longer an operating business entity, but still exists as a shell corporation for purposes of, inter alia, pursuing this action.  (Ashby Dep. 38.)  Although this motion for summary judgment primarily addresses Balmain's case, Feraud is listed as a plaintiff on all filings, and the parties have treated the motion as filed on behalf of both plaintiffs.

Française de la Couture, du Prêt-à-Porter des Couturiers et des Créateurs de Mode (French Federation of Fashion and of Ready-to-Wear of Couturiers and Fashion Designers) (the "Federation").  The Federation controlled the press accreditation process for the fashion shows organized by the plaintiffs that are the subject of the French Judgment.

Defendant Viewfinder Inc. is a Delaware corporation with its principal place of business in New York.  Viewfinder operates an internet fashion magazine called firstView, www.firstview.com, on which it posts photographs of fashion shows, including plaintiffs'.  The photographs are taken by Donald Ashby and Marcio Madeira, respectively the president and vice-president of Viewfinder, who are professional fashion photographers.  The firstView website contains both photographs of the current season's fashions, which may be viewed only by purchasing a subscription, and photographs of past collections, which are available for free. FirstView also sells its photographs of runway shows to various other publications, including Vogue and The New York Times.  See http://www.firstview.com/page.php?i=7 (last visited Oct. 4, 2008).  Viewfinder does not sell clothing or designs.

In the French action, the plaintiffs contended – and the court, after Viewfinder defaulted, found – that Viewfinder made unauthorized use of plaintiffs' intellectual property and engaged in unfair competition by posting photographs of plaintiffs' clothing designs.  The Court then entered judgment in favor of plaintiffs, awarding 1,000,000 francs[2] in compensatory damages.[3] On September 29, 2005, this Court held that the French Judgment's compensatory remedies were

---

[2] The exchange rate of the French franc is locked to the euro at 6.55957 francs.  See http://coinmill.com/FRF_calculator.html (last visited Dec. 17, 2008).  On December 17, 2008, the exchange rate of euros to dollars was 1.00-1.44160.  http://www.xe.com/ucc/convert.cgi.

[3] For a detailed description of the French action, see Feraud II, 489 F.3d at 477-79.

inconsistent with the First Amendment and therefore repugnant to public policy; accordingly, it granted defendant's motions to dismiss and for summary judgment.  See Feraud I, 406 F. Supp. 2d at 274.

On June 5, 2007, the Second Circuit vacated this Court's Order.  The Court of Appeals agreed with this Court that a foreign judgment that conflicted with First Amendment protections of free expression could be repugnant to public policy.  Feraud II, 489 F.3d at 480.   It concluded, however, that "[b]ecause the fair use doctrine balances the competing interests of the copyright laws and the First Amendment, some analysis of that doctrine is generally needed before a court can conclude that a foreign copyright judgment is repugnant to public policy."  Id. at 482.  Moreover, the Court noted that even if Viewfinder's actions would be protected as fair use under American law, enforcing the judgment would not violate public policy if French law provided comparable protections.  Id. at 481-82.  Viewfinder could not default the French actions, declining to take advantage of such protection, and then litigate the fair use issue in the United States instead.  Accordingly, the Second Circuit remanded the action to this Court to determine first "the level of First Amendment protection required by New York public policy when a news entity engages in the unauthorized use of intellectual property at issue here"[4] and second "whether the French intellectual property regime provides comparable protections." Feraud II, 489 F.3d at 480.

_____

[4] Where, as in the instant case, federal jurisdiction rests on diversity of citizenship, federal courts look to the law of the forum state in determining the enforceability of foreign judgments.  Feraud I, 406 F. Supp. 2d at 279 (citing S.C. Chimexim S.A. v. Velco Enters., Ltd., 36 F. Supp. 2d 206, 211 (S.D.N.Y. 1999)).

Thus, this Court was asked to determine (1) whether Viewfinder's actions would constitute fair use under American intellectual property law, and therefore would be protected by the First Amendment, and (2) whether French intellectual property law provided comparable protection to American fair use doctrine. Rejecting this Court's suggestion that the parties proceed to a hearing to determine both issues, or alternatively deal first with the essentially legal determination of the extent to which French intellectual property law permitted defenses analogous to our fair use doctrine, plaintiffs elected to move for summary judgment, arguing that the Court need not reach any issue of French law because defendant's conduct as a matter of law would not be considered fair use under American copyright and First Amendment principles. The evidence relating specifically to the fair use issue will be discussed below.

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court's responsibility is to determine whether there is a genuine issue to be tried, and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. Id. at 254-55. However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact.  Anderson, 477 U.S. at 250. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party.  Id. at 248.

## II.    Fair Use

"With regard to the protections provided by the First Amendment for the unauthorized use of copyrighted material, [the Second Circuit] has held that absent extraordinary circumstances, 'the fair use doctrine encompasses all claims of first amendment in the copyright field.'"  Feraud II, 489 F.3d at 482, quoting Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1378 (2d Cir. 1993).

The fair use doctrine is a statutory exception to copyright infringement.  Section 107 of the Copyright Act permits the unauthorized use or reproduction of copyrighted work[5] "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  17 U.S.C. § 107.  Factors to be considered in determining whether a use of copyrighted material falls within the exception include: (1) "the purpose and character of the use," including whether the use is of a commercial nature; (2) "the

---

[5] Although U.S. copyright law does not provide protection for fashion designs, see, e.g., Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995), French law does provide such protection.  Code de la propriété intellectuelle art. L 112-2 (Fr.), *available at http://www.legifrance.gouv.fr.*  As both this Court and the Second Circuit recognized, Feraud I, 406 F. Supp.2d at 281; Feraud II, 489 F.3d at 480, 483, the difference in scope of copyright protection does not affect the enforceability of the French judgment.  Accordingly, the Court's analysis treats the clothes depicted in Viewfinder's photographs as copyrighted subject matter.

nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in

relation to the copyrighted work as a whole;" and (4) "the effect of the use upon the potential

market for or value of the copyrighted work."  17 U.S.C. § 107.  See Feraud II, 489 F.3d at 482.

There is no bright line rule for weighing these four statutory factors against each other, and no

single factor is dispositive.  See Campbell v. Acuff-Rose Music, 510 U.S. 569, 578 (1994).  "The

ultimate test of fair use . . . is whether the copyright law's goal of promoting the Progress of

Science and useful Arts would be better served by allowing the use than by preventing it."

Castle Rock Entm't, Inc. v. Carol Publ'g Group, 150 F.3d 132, 141 (2d Cir. 1998) (internal

citations and quotation marks omitted).

      The Court of Appeals directed this Court to make findings with respect to the fair use

factors, including in particular "what proportion of plaintiffs' designs were revealed by

[defendants'] photographs."  489 F.3d at 483.  In the context of summary judgment, these facts

must be assessed in the light most favorable to defendant, as the non-moving party.

      **A.**    **Purpose and Character of the Use**

            1.    Transformative Use

      A primary inquiry into any allegedly infringing use is whether the new work "merely

supersedes the objects of the original creation," Campbell, 510 U.S. at 579 (internal citations

omitted), or instead "adds something new, with a further purpose or different character, altering

the first with new expression, meaning, or message; it asks, in other words, whether and to what

extent the new work is 'transformative.'"  Id. (quoting Pierre N. Leval, Toward a Fair Use

Standard, 103 Harv. L. Rev. 1105, 1111 (1990)).  Transformative use is not a requirement for a

finding of fair use, see Sony Corp. of America v. Universal City Studios Inc., 464 U.S. 417, 455

n.40 (1984), but "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."  Campbell, 510 U.S. at 579.

Plaintiffs contend that Viewfinder's use is not transformative because its photographs "leave the character of the original garments unchanged" and are no more than a "photocopy" of plaintiffs' copyrighted creations.  (Pl. Mem. 16.)  Plaintiffs' argument mischaracterizes the relevant caselaw.

While courts have declined to find a transformative use when the defendant has "done no more than find a new way to exploit the creative virtues of the original work," Blanch v. Koons, 467 F.3d 244, 252 (2d Cir. 2006) (citing Davis v. Gap, Inc., 246 F.3d 152, 173 (2d Cir. 2001)) (use of plaintiff's eyewear in a clothing advertisement not transformative because it was "worn as eye jewelry in the manner it was made to be worn"), courts have found a secondary use to be transformative when it is "plainly different from the original purpose for which [the copyrighted work was] created" – even where a secondary user has made an exact replication of a copyrighted image.  Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 609 (2d Cir. 2006); see also Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165 (9th Cir. 2007); Kelly v. Arriba Soft Corp., 336 F.3d 811, 818-19 (9th Cir. 2003); Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 22-23 (1st Cir. 2000).  Viewfinder's argument for transformative use is stronger than those of the defendants in the cited cases, because it did not make an exact replication of plaintiffs' copyrighted works.  In those cases, the copyrighted works were themselves images and not, as in the instant case, three-dimensional, life-sized garments.  As this Court previously explained,

> [t]he notion that photographs merely reproduce reality, and do not apply a creative, or even distorting, eye to the events is long discredited.  The photographer selects the image to be reproduced, capturing a particular angle of view, and that image conveys, in the case of plaintiffs' creations, at best a partial, two-dimensional impression of the actual work . . . Viewfinder has not *copied* plaintiffs' dresses; it has displayed a particular depiction of them.

Feraud I, 406 F. Supp. 2d at 283.

Furthermore, plaintiffs' purpose is to design and market fashion while firstView's purpose  – or at least one of its primary purposes – is to provide the public with news dispatches from the front lines of the fashion world.  (Ashby Dep. 53, 58.)[6]  Since firstView reports from all the fashion shows of a given season, its photographs capture not only the latest trends in clothing design but also the overall aesthetics of the fashion shows and the ideals of beauty they represent – including the models' makeup, hairstyles, body types, and ethnicities, and the stage design of the presentations.  FirstView converts plaintiffs' designs from things to buy into indicia of larger industry patterns and social trends – in other words, into news.  Thus, despite Viewfinder's leaving the "character of the original garments unchanged," a reasonable factfinder could find its secondary use highly transformative.

## 2. Commercial Use

Another inquiry under the first factor is whether the allegedly infringing use is of a commercial nature or is instead for nonprofit educational purposes.  17 U.S.C. § 107(1). Although a secondary use's commercial character tends to weigh against a finding of fair use, "[t]he mere fact that a use is educational and not for profit does not insulate it from a finding of

---

[6] Deposition page cites refer to the deposition transcript's pagination, not that of the exhibit in which the transcript can be found.

infringement, any more than the commercial character of a use bars a finding of fairness."

Campbell, 510 U.S. at 584 (noting that if commerciality were to carry "presumptive force against

a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in

the preamble paragraph of § 107, including news reporting, comment, criticism, teaching,

scholarship, and research, since these activities are generally conducted for profit") (internal

citations omitted).  Accordingly, the Second Circuit has been careful "not [to] give much weight

to the fact that [a] secondary use was for commercial gain."  Castle Rock Entm't, 150 F.3d at

141.

      Viewfinder's use of its photographs of plaintiffs' designs is undisputedly commercial.

FirstView has generated both subscription and advertising revenue, as well as profits from the

sale of individual photographs to other publications.[7]  (Ashby Dep. 51, 165-66, 195-98, 203-09.)

The images on the firstView website thus serve as both the content of its newsmagazine and also

as a catalog of products available for purchase.

      Courts have looked disapprovingly at the "commercial exploitation" that occurs when an

allegedly infringing user "directly and exclusively acquires conspicuous financial rewards from

its use of the copyrighted material."  American Geophysical Union v. Texaco Inc., 60 F.3d 913,

922 (2d Cir. 1994).[8]  In the instant case, Viewfinder is not merely profiting by *using* images of

plaintiffs' copyrighted work in the content of its magazine; it is also profiting by *selling* images

---

    [7] The record contains evidence that firstView no longer runs advertisements and did so
only for part of the time period relevant to the underlying litigation. (Ashby Dep. 210-12.)

    [8] The Second Circuit has, however, also questioned "[w]hether 'exploitation' is an
analytically useful term or only a label attached to works deemed not protected by the fair use
defense."  Twin Peaks, 996 F.2d at 1375.

of plaintiffs' copyrighted work directly.  This wholesale aspect of Viewfinder's business would weigh strongly in plaintiffs' favor but for a few mitigating considerations.

First, the instant action can be distinguished from cases where courts have found commercial exploitation in that Viewfinder is not trying to profit by selling *plaintiffs*' images;[9] rather it is selling *its own* images – that is, the photographs which Ashby and Madeira took and of which firstView owns the copyright – which in turn depict plaintiffs' copyrighted designs. Courts have long recognized that photographs are a form of artistic expression, see, e.g., Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884), and not merely a "photocopy" of the subjects depicted therein.

Second, courts tend to be solicitous of works which, "though intended to be profitable, aspire[] to serve broader public purposes."  Twin Peaks, 996 F.2d at 1375.  FirstView arguably qualifies as such a work in its capacity as an online newsmagazine.  It documents events which are of public interest and is regularly used as a reference tool by students and professionals alike. (Declaration of Donald Ashby, dated March 21, 2008 ¶¶ 15-18.)   Finally, Viewfinder's position is buttressed by the fact that "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  Harper & Row, Publrs. v. Nation Enters., 471 U.S. 539, 562 (1985).  In Harper & Row, the defendant "knowingly exploited a purloined manuscript" rather than pay the customary price – the $25,000 paid by the winning

---

[9] See, e.g., Iowa State Univ. Research Found., Inc. v. American Broad. Cos., Inc., 621 F.2d 57, 61 (2d Cir. 1980) (ABC telecasts containing portions of film on wrestler were "commercial exploitation"); Meeropol v. Nizer, 560 F.2d 1061, 1069 (2d Cir. 1977) (book containing someone else's copyrighted letters could constitute "commercial exploitation").

bidder – for first serial rights.  Id.  In the instant case, there is no "customary price" which plaintiffs usually charge to allow newspapers and magazines to publish photographs of their designs; on the contrary, they *invite* the media to their fashion shows with the expectation that they will publish such photographs.

For these reasons, while the commercial nature of Viewfinder's actions may well count against a finding of fair use, a factfinder would have to carefully weigh these other concerns before determining whether and to what extent this factor supports plaintiffs' position.

3. Propriety of Defendant's Conduct

As a final consideration under the first factor of the fair use analysis, plaintiffs assert that Viewfinder acted in bad faith and that this bad faith should weigh in plaintiffs' favor.  This consideration too presents disputed issues of fact.

The evidence would support a finding that Ashby and Madeira acted in violation of the terms of their press accreditation, which stated that "[p]hotographs can only be used by newspapers or magazines duly represented at the collections, are limited to seven garments, and may not be sold or even given to anybody."[10]  (Ashby Dep. 172.)   It is undisputed that Ashby and Madeira have never sought accreditation for firstView but have instead received their press credentials through The New York Times Magazine (Ashby), and L'Officiel, Elle, and Elle International (Madeira).  (Ashby Dep. 150-52.)  It is also undisputed that Ashby and Madeira used their photographs for firstView, a magazine which was not "duly represented at the

_____

[10] This was the accreditation language during the time period of the underlying litigation. (Ashby Dep. 170-71.)  The Federation's current accreditation policy states that "photographers are prohibited from supplying their photos . . . to any media other than those for which they are accredited and/or from making use of them in any other way without the express written consent of the rights owners."  (Declaration of James P. Duffy, III, dated Feb. 15, 2008, Ex. 1 at 10.)

collections," and also that, through firstView, they sold the photographs they took at the shows.

That Ashby and Madeira acted in violation of the terms of their licenses may give the Federation reason to revoke those licenses,[11] but that violation is not necessarily tantamount to a showing of bad faith within the meaning of that term for purposes of the fair use doctrine.  In Harper & Row, the Court found bad faith on the part of the defendant where the secondary use "had not merely the incidental effect but the *intended purpose* of supplanting the copyright holder's commercially valuable right of first publication" and where defendant had "knowingly exploited a purloined manuscript."  471 U.S. at 562-63 (emphasis added).  In this case, Ashby testified that he and Madeira were unaware of the abovementioned restrictions on accreditation since the paperwork was filled out by the publications for which the photographers were accredited and not by the photographers themselves.  (Ashby Dep. 176.)  Ashby also testified that he did not think it was necessary to apply for separate accreditation for firstView when he and Madeira were already accredited for other publications.  (Ashby Dep. 160.)  Whether these explanations are credible is not to be decided at this stage of the litigation; on summary judgment, a court must construe the facts in the light most favorable to the nonmoving party. Thus, whether defendant acted in bad faith presents issues of fact for resolution at trial.

### 4. Conclusions as to the First Factor

The inquiry into the "character and purpose" of the alleged infringer's use is fact-intensive, and requires a subtle balancing of several sub-factors, each of which in turn involves

---

[11] The litigation against Viewfinder began in 2001 in France.  The fact that Ashby and Madeira still receive press accreditation from the Federation and that firstView is still alive and well – and has as clients some of the biggest names in the fashion media – would suggest at least a tacit condonation of firstView by the Federation and by the publications for which Ashby and Madeira are actually accredited.

the resolution of disputed facts.  Depending on how those disputes were resolved, a reasonable

fact-finder could find that Viewfinder's use of plaintiffs' designs is transformative, that its use

did not amount to commercial exploitation, and that Viewfinder did not act in bad faith.

Moreover, even if not all of these considerations were found to favor the defendant, the

appropriate balance of the considerations is itself a factual question that is not, on this record,

appropriately made on summary judgment.

### B. The Nature of the Copyrighted Work

The second statutory factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2),

"calls for recognition that some works are closer to the core of intended copyright protection

than others, with the consequence that fair use is more difficult to establish when the former

works are copied."  Castle Rock Entm't, 150 F.3d at 144 (quoting Campbell, 510 U.S. at 586).

Creative works, such as plaintiffs', are typically given broader protection than factual works.

See Stewart v. Abend, 495 U.S. 207, 237 (1990).  This broad protection is qualified, however,

where – as here – the "creative work of art is being used for a transformative purpose."  Bill

Graham Archives, 448 F.3d at 612.

The second important aspect of a copyrighted work's "nature" is whether it is published

or unpublished.  See, e.g., Blanch, 467 F.3d at 256.  The scope of fair use is narrower with

respect to unpublished works because "the author's right to control the first public appearance of

his undisseminated expression" usually trumps any use of the work before its release.  Harper &

Row, Publrs., 471 U.S. at 555.  Thus, "[u]npublished works are the favorite sons of factor two."

Wright v. Warner Books, Inc., 953 F.2d 731, 737 (2d Cir. 1991).

14

In most cases, there is little or no dispute about whether the copyrighted work has had its "first public appearance."  In Harper & Row, for example, no one disputed that Gerald Ford's memoirs were unpublished and that The Nation had interfered with the publisher's valuable right to license prepublication excerpts to another news magazine.  471 U.S. at 542.  In Campbell, meanwhile, no one disputed that Roy Orbison's "Oh Pretty Woman" had been released to the public for than twenty-five years before 2 Live Crew came out with its rap parody of the song.  510 U.S. at 572.

Here, though, whether plaintiffs' works have had their public debut is a matter of contention.  Plaintiffs assert that, because the fashion shows were not open to the general public, their designs had not yet had their first public appearance when firstView published its photographs.[12]  This argument is hardly conclusive.  Viewfinder points out that approximately

_____

[12] While plaintiffs contend that the fashion shows were not the first public appearance of their designs, it is not apparent from their briefing papers what exactly they *do* consider the designs' first public appearance to be.  If by "publication," they mean the literal appearance of their copyrighted work in the printed media, plaintiffs did not control that anyway.  First, it was the Federation and not plaintiffs themselves who controlled the press accreditation process.  (Diemoz Dep. 77.)  Second, plaintiffs do not – and cannot – control media coverage of their brands.  They are of course free to choose the publications to which they grant interviews or in which they advertise.  But just as plaintiffs have no guarantee that Vogue or L'Officiel or other "desirable" media will run photographs of their new designs, let alone review them favorably, so they cannot prevent the "common media" from covering their latest designs.  (Diemoz Dep. 83.)

The Copyright Act defines publication as "[t]he distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," and specifies that "offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication."  17 U.S.C. § 101.  To the extent that plaintiffs are relying on the Act's definition of "publication," plaintiffs' designs would have their first appearance when they are first offered for sale.  It is unclear from the record whether plaintiffs' new designs are offered for sale at or simultaneously with their runway shows.  If they are, plaintiffs' works were already published before firstView posted its images of the runway shows, and firstView could not have interfered with plaintiffs' publication rights.  Even if the clothes were not yet on sale to the public at the time of the shows, plaintiffs are still unable to demonstrate that the publication of firstView's photographs – which occurred in tandem with the publication of similar photographs in newspapers and magazines around the

800 buyers, 2000 journalists, 400 photographers, and other fashion professionals attend the Paris fashion shows each season.  (Pl. Mem. 7.)  Even though admittance to the shows is by invitation only, it is difficult to classify as "private" highly-publicized commercial exhibitions to which the international media has been invited, and for which public attention is not only expected but courted.  As this Court noted in Feraud I, the "First Amendment simply does not permit plaintiffs to stage public events in which the general public has a considerable interest, and then control the way in which information about those events is disseminated in the mass media."  406 F. Supp. 2d at 285.

Plaintiffs concede that a great deal of thought and money goes into conceiving and executing its runway shows and that these funds come from their marketing budget.  (Diemoz Dep. 153.)  Ashby and Madeira did not sneak into plaintiffs' ateliers and circulate photographs of new designs before plaintiffs had unveiled them.  Instead, firstView posted photographs of plaintiffs' clothing designs *as plaintiffs had chosen to display them* – in the location, and with the decor, lighting, models, hairstyles, and makeup of plaintiffs' choosing – *after* this public unveiling had occurred.

That plaintiffs' work is creative undoubtedly pushes the second fair use factor in plaintiffs' direction.  But once again, the factor is complex and turns on factual judgments. Because Viewfinder used plaintiffs' creative work for a transformative purpose, and because a reasonable fact-finder could conclude that its use did not interfere with plaintiffs' ability to control the first public appearance of their work, this factor too requires a fact-intensive balancing, and a fact-finder could determine that this factor should be given lesser weight, or

---

world – interfered in any way with their control over the circumstances of the first offering of their goods for sale.

even that it favors Viewfinder.

### C. Amount and Substantiality of the Portion of the Copyrighted Work Used

The third factor in a fair use analysis examines "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," and whether such an amount is reasonable in relation to the purpose of the copying. See Campbell, 510 U.S. at 587 (quoting 17 U.S.C. § 107(3)). Courts have recognized that the extent of permissible copying varies with the purpose and character of the use. Id. This factor is significant in a determination of fair use, and the Court of Appeals specifically instructed this Court to make factual findings with respect to "what proportion of plaintiffs' designs were revealed by [defendant's] photographs." 489 F.3d at 483.

In the instant case, firstView posted full-length photographs of each garment which plaintiffs displayed at their shows. FirstView's photographs thus depicted 100% of the designs that made up a given season's collection. (Ashby Dep. 133-34.) Though Ashby testified that the photographs depicted the entirety of each copyrighted garment, the actual photographs of the shows from the relevant years are not part of the record.[13] Ashby's deposition testimony indicates that most garments were only depicted once – and from a direct, head on perspective – on the firstView website but that a few garments were represented by several photos, which showed the clothing from a different depth or slightly different angle. (Ashby Dep. 62, 77-78, 81-82.) Since the photographs are by definition two-dimensional depictions of three-dimensional works, it is not clear to what extent the entire *design* was depicted, or only the

---

[13] The absence of such photographs from the record is especially surprising given both the Court of Appeals' instructions and the fact that the parties examined and discussed these photos during Ashby's deposition. (See, e.g., Ashby Dep. 60, 67-75, 81-82, 138.)

overall look of each garment in frontal view.

Furthermore, even if firstView published all of plaintiffs' copyrighted works, the Second Circuit has found that entire reproductions can be justifiable where the purpose of the secondary work differs from the original.  See Bill Graham Archives, 448 F.3d at 613.  In this case, Viewfinder did not copy any percentage of plaintiffs' designs "verbatim," as it were, since it did not produce copies of plaintiffs' actual clothing or copies of the patterns or designs from which they were produced.  See Mattel Inc. v. Walking Mt. Prods., 353 F.3d 792, 803 (9th Cir. 2003) (a verbatim copy of plaintiff's copyrighted product would be an exact three dimensional reproduction of the doll, not defendant's *photograph* which included in it a full Barbie doll).  In addition, as discussed above in Section A, Viewfinder's purpose in using plaintiffs' copyrighted designs was different from plaintiffs' purpose.  Extensive use could be found to be reasonable since firstView's aim was to provide comprehensive coverage of the season's fashion shows.  Cf.  Kelly v. Arriba Soft Corp., 336 F.3d 811, 821 (9th Cir. 2003).

Any reasonable fact-finder would have to conclude that Viewfinder's use of plaintiffs' work was extensive.  But the ultimate weight of this factor in the fair use balance would again depend on factual findings with respect to whether this use in fact amounted to the "comprehensive" or "total" use alleged by plaintiffs, balanced against the transformative and distinctive purpose of defendant's use.

### D. Effect of the Use on Potential Markets for or Value of the Copyrighted Work

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  An analysis of this factor must take into account not only harm to the original but also harm to the market for derivative works.  Harper & Row,

Publrs., 471 U.S. at 568.

### 1. Effect on the Market for Plaintiffs' Products

For the first inquiry – the effect of the use on the original market for the copyrighted work – courts have considered whether the secondary use (1) fulfills the demand for the original work, see Wainwright Securities Inc. v. Wall Street Transcript Corp., 558 F.2d 91, 96 (2d Cir. 1977), or (2) diminishes or prejudices the potential sale of the work.  See Meeropol v. Nizer, 560 F.2d 1061 at 1070 (2d Cir. 1977).

Plaintiffs' claim that Viewfinder's unauthorized use fulfills the demand for their original work is without merit.  Plaintiffs' designs were for clothing, which is the product they sell; defendant sold photographs.  A photograph on the internet is plainly no substitute for an actual item of clothing that purchasers can wear and use.  As to plaintiffs' claim that the photographs substitute for the *designs* which plaintiffs license to "third parties . . . to manufacture and sell . . . to upscale retail establishments around the world" (Declaration of Emmanuel Diemoz, dated Apr. 1, 2008 at ¶ 5), Balmain's own website depicts photographs of all the designs from its latest runway shows.  See http://www.balmain.com (last visited Oct. 11, 2008).  These photographs are not sold by Balmain, but are available for public view.  Thus, to the extent that firstView's photographs are capable of fulfilling demand for plaintiffs' designs (as distinguished from the actual items of clothing), plaintiffs themselves are equally "guilty" of fulfilling this demand.

Plaintiffs further raise the concern that, by making depictions of their creative work widely available, Viewfinder's efforts facilitate the production of low-cost imitative "knock-offs" of their designs by unlicensed clothing manufacturers.  (Pl. Mem. 18; Pl. Rule 56.1 Statement ¶ 16.)  Such an effect is certainly plausible, but it cannot be merely assumed.  There is

no evidence in the record that such mass-market imitations affect the sale of the high-fashion couture designs actually exhibited at the fashion shows, or even of the relatively low-priced ready-to-wear goods which plaintiffs license to department stores.  Nor is there evidence from which a fact-finder could assess the extent to which the production and marketing of knock-off designs is actually facilitated by Viewfinder's publications, as distinct from plaintiffs' own publication of photographs of their designs, or the widespread publicity, including publication of photos of the shows, that plaintiffs and the Federation invite.[14]

While a reasonable fact-finder could well conclude that the defendant's activities affect the market for plaintiffs' products, the extent of such an effect cannot be determined as a matter of law on this record.

### 2. Effect on the Market for Photographs of Plaintiffs' Products

The fourth factor favors a defendant when the secondary use "fill[s] a market niche that the plaintiff simply ha[s] no interest in occupying," Twin Peaks Prods., 996 F.2d at 1377, or falls outside the "traditional, reasonable, or likely to be developed markets" for derivative works.[15]

---

[14] Although the argument is not advanced in plaintiffs' briefing, at his deposition, Emmanuel Diemoz, Balmain's Chief Financial Officer, also asserted that firstView diluted plaintiffs' brands by running photos of their clothes in the "common media" (as opposed to the "elitist" publications with which plaintiffs strove to be associated) and by showing plaintiffs' clothes next to advertisements for discounted flight companies, cubic zirconia rings, and other products which were "not very high fashion."  (Diemoz Dep. 83, 138.)  Plaintiffs have not, however, adduced any concrete evidence that firstView's postings actually affected their marketability in any way.  (See id. at 133-34.)   Additionally, as discussed above in note 12, regardless of Viewfinder's efforts, plaintiffs simply cannot exercise full control over media coverage of their brands and the contexts in which their designs can be depicted.

[15] Courts are split on the issue of whether photographs of a copyrighted work should even be considered derivative works.  The Copyright Act defines a derivative work as one "based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted."  17

American Geophysical Union, 60 F.3d at 929-30.  As might be expected,

> copyright holders rarely write parodies of their own works, or write
> reviews of them, and are even less likely to write new analyses of
> their underlying data from the opposite political perspective.  On the
> other hand, it is a safe generalization that copyright holders, as a
> class, wish to continue to sell the copyrighted work and may also
> wish to prepare or license such derivative works as book versions or
> films.

Twin Peaks Prods., 996 F.2d at 1377 (internal citations omitted).

In the instant case, plaintiffs claim that, were it not for Viewfinder, media companies

would have to approach the fashion houses and purchase photographs directly from them.  (Pl.

Mem. 26.)  While this argument is appealing, it is undermined by the fact that plaintiffs do not

themselves sell or license photos of their designs to the media.  (Diemoz Dep. 121.)  In fact,

although there is a market for photos of plaintiffs' designs – firstView's client base demonstrates

as much – design houses, as least so far as is evident from the record, have never operated as

suppliers for such a market.  Designers are in the business of selling clothes; charging the media

for the right to use photos of the very products they are trying to promote would be a poor

_____

U.S.C. § 101.  The Ninth Circuit recently noted that "[i]n a colloquial sense, of course, a
photograph is derived from the object that is its subject matter . . . . But simply because
photographs are in this colloquial sense 'derived' from their subject matter, it does not
necessarily follow that they are derivative works under copyright law."  Ets-Hokin v. Skyy
Spirits, 225 F.3d 1068, 1077-78 (9th Cir. 2000).  The Ets-Hokin Court ended up holding (1) that
a derivative work must be based on a preexisting work that is copyrightable; and (2) that the
subject of the specific photograph in question was a utilitarian object not protected by copyright.
Id.  Underlying this holding is the assumption that photographs are derivative works so long as
they depict copyrightable subject matter.  In the same year, however, a court in this District took
the position that photographs of copyrighted objects did not constitute derivative works.  See
SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 306 (S.D.N.Y. 2000) ("A
photograph of Jeff Koons' 'Puppy' sculpture in Manhattan's Rockefeller Center merely depicts
that sculpture; it does not recast, transform, or adapt Koons' sculptural authorship.  In short, the
authorship of the photographic work is entirely different and separate from the authorship of the
sculpture.").  For purposes of this motion, the Court assumes without deciding that a photograph
of a creative work, intended as news reportage of the nature of that work, is a derivative work.

publicity strategy, and in any event is one that plaintiffs apparently do not pursue.

One could imagine an alternate reality in which runway shows were completely off-limits to media and in which design houses charged the media to run photographs of their designs; this is not, however, the way the fashion world actually operates.  Part of the excitement of a runway show comes from flashbulbs popping and cameras swarming.  Although essentially the same shots of the new designs might be achieved by a sole in-house photographer as by 50 photographers from different publications around the world, those other 49 photographers add more to the couturiers' efforts than simply slightly different camera angles.  Not only do they disseminate their photographs to diverse publications, but their presence in and of itself helps create the aura of glamour, of news, of an *event*.  A reasonable fact-finder could thus easily conclude that the fashion industry, at least as it is currently constituted, needs the media as much as the media needs it.  Under these circumstances, the idea that Viewfinder undermines a market among news publications for photographs of fashion shows that plaintiffs could themselves exploit appears far-fetched.[16]

### 3. Conclusions as to the Fourth Factor

A reasonable fact-finder thus would not be required to find that Viewfinder's use of plaintiffs' products harmed the market for plaintiffs' original product, and would be hard put on

---

[16] Courts have held in certain circumstances that copyright holders should be entitled to control the market for derivative works, regardless of whether they choose to exploit such a market themselves.  See Castle Rock Entm't, 150 F.3d at 145-46 ("It would . . . not serve the ends of the Copyright Act – i.e., to advance the arts – if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original.") (internal citation and quotation marks omitted).  In the instant case, plaintiffs ceded their "monopoly" over derivative versions of their works – at least with respect to photographic depictions of their clothes – when they permitted their designs to be photographed and disseminated throughout the international media.

this record to determine the extent of any harm that did exist.  Moreover, such a fact-finder would be unlikely to find that such use intruded on any market for derivative products that plaintiffs had an interest in occupying.  Under these circumstances, whether and to what extent this factor favors a finding of no fair use presents an issue for trial.

### E. Combined Effect of the Four Factors

Taking the factors together, it cannot be said as a matter of law that no reasonable fact-finder could conclude that the fair use factors weigh in favor of Viewfinder's use.  For the first factor, Viewfinder's use of photos of plaintiffs' designs as news items is transformatively different from the original purposes of plaintiffs' copyrighted creations.  The second factor might well be found to favor Viewfinder because its use did not interfere with plaintiffs' ability to control the first public appearance of their work.  Because firstView appears to have depicted the entirety of plaintiffs' collections, the third factor would most likely weigh in favor of plaintiffs, but the weight to be given to this factor as against other factors depends on factual disputes about whether firstView's use of the images was consistent with, and reasonable in light of, its transformative purpose, and in any event the weight of this factor cannot be determined in isolation from the other factors against which it must be balanced.  Finally, whether and to what extent Viewfinder's use harms the market for plaintiffs' sale of either the copyrighted clothes themselves or the designs on which they are based presents unresolved factual issues.

Accordingly, on this record, it simply cannot be held as a matter of law that Viewfinder's actions could not be found to be protected as fair use under American law.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is denied.  The

parties are directed to meet and confer as to whether the next step in the process should be a trial

on the fair use issue, or the submission of legal arguments with respect to the extent to which

French law provides protections analogous to fair use, and to report their respective positions on

this issue to the Court on or before January 16, 2009.


SO ORDERED.

Dated: New York, New York
       December 19, 2008

GERARD E. LYNCH
United States District Judge

24